IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION

**MERVIN B. STURGEON.**
on behalf of himself and others similarly situated,

    Plaintiff,

v.

**CITY MANAGER ROBERT HERRON,**
individually and in his official capacity,
**THE CITY OF WHEELING,** its division,
**THE WHEELING POLICE DEPARTMENT,** and
**THE WEST VIRGINIA DIVISION OF HIGHWAYS,**
an agency of **THE WEST VIRGINIA DEPARTMENT OF TRANSPORTATION**

    Defendants.

> ELECTRONICALLY FILED
> **09/02/2020**
> U.S. DISTRICT COURT
> Northern District of WV

Civil Action No. 5:20-CV-192
(Bailey)

## PLAINTIFF'S VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FOR CONSTITUTIONAL VIOLATIONS

While the State of West Virginia is in the midst of a global pandemic, the residents of Wheeling's tent encampment communities face the imminent threat of the loss of their homes and property on Friday, September 4, 2020. This date is two days from the date of this filing and only three days from the time notice was posted in the encampments.

Plaintiff, Mervin "Vin" B. Sturgeon, by and through undersigned counsel, comes now and asserts that the Defendants, City Manager Robert Herron, the City of Wheeling, and the Wheeling Police Department have jointly arranged to carry out the search, seizure, and destruction of Plaintiff's personal property without providing adequate notice or any opportunity to be heard, and without a warrant, in violation of Article Three, Sections One, Six, Ten, and Seventeen of the West Virginia Constitution, the Fourth and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. Section 1983.

This is not the first time that Defendants have targeted tent encampment residents during the COVID-19 pandemic. On April 14, 2020, when the State of West Virginia was under a "stay at home" order issued by the governor in light of the COVID-19 pandemic, Defendant City Manager Robert Herron, jointly with the Wheeling Police Department, directed and ordered the search, seizure, and destruction of the homes of a number of individuals that reside in tent encampments in Wheeling. The City did so without a warrant, and without providing adequate notice or any opportunity to be heard. The City's actions were in contravention to guidance issued by the Centers for Disease Control and Prevention advising municipalities to avoid tearing down encampments during the pandemic, and to seek alternative housing for anyone who might be displaced. [1]

Five months later, the COVID-19 pandemic continues unabated. The threat to those who are housing insecure remains. In fact, on September 1, 2020, the Centers for Disease Control and Prevention issued a temporary moratorium on evictions "to prevent the further spread of COVID-19," noting that "[i]n the context of a pandemic, eviction moratoria—like quarantine, isolation, and social distancing—can be an effective public health measure utilized to prevent the spread of communicable disease."[2] Although the moratorium is not directly applicable to

---

[1] People Experiencing Homelessness and COVID-19, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html (last visited Apr. 29, 2020).

[2] Centers for Disease Control and Prevention, Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19 (Sept. 1, 2020), https://s3.amazonaws.com/public-inspection.federalregister.gov/2020-19654.pdf (to be published in the Federal Register Sept. 4, 2020).

encampments, the public health threat to those displaced from encampments is the same.

On the same day that the Centers for Disease Control and Prevention announced the moratorium, notices were posted at locations near at least two encampments in Wheeling, giving encampment residents a mere 3 days to vacate their homes and offering no provision for storage for the residents' property after that time. Pursuant to the notice, posted below, **law enforcement intends to remove the homes of residents approximately 48 hours from the time of this filing.**



3

Moving forward with these actions would displace members of the Wheeling community in the midst of a global pandemic wherein at the time of filing approximately 10,642 people in West Virginia have tested positive for the highly contagious COVID-19 virus and 230 people in the state have died after contracting the virus.[3]

The City's actions this week continue a months-long harassment campaign against Wheeling residents that reside in the encampments. In the time since the City destroyed the first encampment in April, city officials have publicly stated that they intend to tear down other encampments. Additionally, in the time since the teardown of the first encampment, and subsequent to negative publicity following the teardown, police have also returned to the encampment area and *taken into custody* at least two residents for "littering," without providing to those individuals a citation to any applicable statute or ordinance or to an authority governing associated criminal penalties.[4] Plaintiff and those similarly situated reasonably fear retaliation for advocating for themselves regarding the potential loss of their property.

Plaintiff, on behalf of himself and those similarly situated—and in the interest of preserving their fundamental rights and in protecting the health of all members of the Wheeling community—is seeking a preliminary injunction to bar the City from tearing down encampments.

---

[3] Coronavirus Disease 2019 (COVID-19), West Virginia Department of Health and Human Resources, *available at* https://dhhr.wv.gov/COVID-19/Pages/default.aspx (last visited April 29, 2020).

[4] Declaration of Roberta Sheets, attached as Exhibit A.

4

## PARTIES

1. Plaintiff Mervin B. Sturgeon is a resident of an encampment located by the Chapline Street Bridge in Wheeling, West Virginia.

2. Defendant City Manager Robert Herron serves as the City Manager of Wheeling and has served in that position at all times relevant in this Complaint.

3. Defendant City of Wheeling is a municipal corporation, for which Robert Herron exercises supervision over City departments, and he is the chief executive and administrative officer of the City government in relation to activities in the City in the exercise of its powers, functions, rights, duties, and privileges.

4. Defendant Wheeling Police Department is an agency or instrumentality of the City of Wheeling.

5. Defendant Division of Highways is an agency within the West Virginia Department of Transportation. The Division of Highways is charged with the maintenance of state roads and bridges, including, upon information and belief, the Chapline Street Bridge in Wheeling.

## FACTS AND BACKGROUND

### *Wheeling's Encampments*

6. There are at least four encampment areas located in the City of Wheeling. Approximately 30-40 residents live in tents that are constructed in these areas.

7. The location where Mr. Sturgeon resides is located at an encampment near the Chapline Street Bridge in Wheeling.

8. Residents of the encampments are a community, consider each other neighbors, look out for the other residents, and respect others' spaces.

*The COVID-19 Pandemic*

9. The novel coronavirus, which first emerged in late December 2019, causes a virus known as COVID-19, which is spreading exponentially across the world, the country, and across West Virginia. The World Health Organization has declared COVID-19 a pandemic.[5] There is no known vaccine, and no uninfected person is immune.[6]

10. While it was initially believed that COVID-19 has disproportionately high rates of infection among older or otherwise vulnerable adults, such as those with preexisting conditions and comorbidities, it has since been determined that the virus impacts all age groups.[7] Indeed, the virus can have devastating impacts, and can be fatal, even in the youngest infected patients.[8] The virus is difficult to treat or prepare for, as it varies in degree with each infected person, with no identifiable commonalities among particular groups and no specific individual developing consistent or predictable responses to the disease.

11. The number of individuals testing positive for COVID-19 spikes dramatically on a daily basis. Moreover, it is not clear if the virus has reached what is known as its apex, or peak in any geographical area within the United States, meaning that one certain timespan, lasting for an unknown length of days or weeks,

---

[5] Betsy McKay et al., *Coronavirus Declared Pandemic by World Health Organization*, Wall St. J. (Mar. 11, 2020, 11:59 PM), https://www.wsj.com/articles/u-s-coronavirus-cases-top-1-000-11583917794.

[6] How to Protect Yourself and Others, Centers for Disease Control and Prevention, *available at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Sept. 2, 2020).

[7] Vanessa Caceres, *Why Young People Should Care About Covid-19*, U.S. News and World Report (Apr. 3, 2020), https://health.usnews.com/conditions/articles/why-young-people-should-care-about-covid-19.

[8] *Id.*

will account for the highest number of infections to date. As of September 2, 2020, more than 25 million people worldwide have been diagnosed with COVID-19 and more than 850,000 of those people have died.[9]

12. As of the date of this filing, there are more than 6 million reported cases in the United States, with more than 183,000 of those cases resulting in death.[10]

13. As of the date of this filing, there are more than 10,600 confirmed cases of COVID-19 in West Virginia, with 230 of those cases resulting in death.[11]

14. Older adults and those with certain medical conditions face greater chances of serious illness or death from COVID-19.[12] Certain underlying medical conditions increase the risk of serious COVID-19 disease for people of any age—including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, and pregnancy.[13]

---

[9] Coronavirus Disease (COVID-19), World Health Organization, https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited Sept. 2, 2020).

[10] Coronavirus Disease (COVID-19), Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Sept. 2, 2020).

[11] Coronavirus Disease 2019 (COVID-19), West Virginia Department of Health and Human Resources, *available at* https://dhhr.wv.gov/COVID-19/Pages/default.aspx (last visited Sept. 2, 2020).

[12] People Who Are at Higher Risk for Severe Illness, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

[13] *See, e.g., id.*

15. The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 than from influenza. According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems. According to preliminary data from China, 20 percent of people in high-risk categories who contracted COVID-19 there died.[14]

16. The Centers for Disease Control and Prevention has determined that people experiencing homelessness are an at-risk group for COVID-19, noting that "[b]ecause many people who are homeless are older adults or have underlying medical conditions, they may also be at increased risk for severe illness." [15]

17. For this reason, the CDC has advised the following:

> If individual housing options are not available, allow people who are living unsheltered or in encampments to remain where they are. **Clearing encampments can cause people to disperse throughout the community**

---

[14] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer"); Wei-jie Guan et al., *Comorbidity and its impact on 1,590 patients with COVID-19 in China: A Nationwide Analysis*, medRxiv (Feb. 27, 2020), at 5, https://www.medrxiv.org/content/10.1101/2020.02.25.20027664v1.full.pdf (finding that even after adjusting for age and smoking status, patients with COVID-19 and comorbidities of chronic obstructive pulmonary disease, diabetes, hypertension, and malignancy were 1.79 times more likely to be admitted to an ICU, require invasive ventilation, or die, the number for two comorbidities was 2.59); Fei Zhou et al., *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study*, Lancet (March 11, 2020), tb. 1, https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext (finding that among hospital patients, who tended to be older, of those who had COVID-19 and died, 48% had hypertension, 31% had diabetes, and 24% had coronary heart disease).

[15] People Experiencing Homelessness, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/homelessness.html (last visited Apr. 29, 2020).

>and break connections with service providers. This increases the potential for infectious disease spread.[16]

### *Threat to Encampment Residents*

18. On or around September 1, 2020 at 12 p.m., at least three notices were posted in locations near tent encampments.

19. Upon information and belief, some encampments are located on state property that is managed and maintained by the West Virginia Division of Highways, an agency of the West Virginia Department of Transportation.

20. Although the posted notices bear the logo of the City of Wheeling, it is unclear whether or not the Division of Highways or the Department of Transportation could assert jurisdiction and seek to enforce the Notices unilaterally via the state police or other agents or assigns.

21. Plaintiff Mervin B. Sturgeon resides at an encampment by the Chapline Street Bridge, and saw the notice after it was posted on September 1, 2020 by his residence.

22. The Notice states that "[p]ursuant to the City of Wheeling Homeless Encampment and Transient Outdoor Temporary Living Policy, the City of Wheeling is giving you notice that the City will close this site on Sept. 4, 2020."[17]

---

[16] People Experiencing Homelessness and COVID-19—Interim Guidance, Centers for Disease Control and Prevention, *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html?fbclid=IwAR21sUu_kLjbi1N97MtP6eEDKiX8pEqzf-mF94z2xCqjnLjFyJ-GInL6_XI (last visited Sept. 2, 2020) (emphasis added).

[17] Notice, attached as Exhibit B.

23. The policy cited does not appear to be available on the City's website, nor does it appear to be codified in the City's ordinances.

24. The Notice does not include any details of the content of the purported "City of Wheeling Homeless Encampment and Transient Outdoor Temporary Living Policy."

25. The Notice further provides that "[a]ll personal property remaining on this site after 5:00 p.m. on Sept. 4, 2020 is subject to removal by the City of Wheeling."

26. The Notice does not provide a location at which property of residents would be stored after 5 p.m., indicating that the City of Wheeling may destroy the property at that time or otherwise not make it available to encampment residents who are unable to move their property in such a short timeframe.

27. The Notice does not provide a contact or department that encampment residents can contact to appeal the City's decision to dismantle the encampments, nor does it provide for an opportunity for affected residents to be heard.

28. The Notice directs "persons needing assistance with housing" to contact the "Greater Wheeling Coalition for the Homeless" or "Project Hope."

29. Upon information and belief, the Greater Wheeling Coalition for the Homeless has is restricted by funding on who it may house, and many encampment residents may not qualify for housing through the Coalition.

30. Project Hope is a "collaboration of medical, nursing, social work, pastoral care and other healthcare professionals who serve together on the street and in the homeless shelters in Wheeling." The organization provides "basic medical

care, food, water, clothing, follow-up appointments and information on agencies and services."[18]

31. Upon information and belief, Project Hope does not place displaced individuals in housing.

32. Mr. Sturgeon's property includes his tent, sentimental objects of value including photos of family and friends, clothing, food, and other property vital to his survival.

33. Mr. Sturgeon does not know where he will live if he is displaced from his home on September 4.

34. Mr. Sturgeon does not have access to a facility to store his belongings before the City intends to move forward in removing his residence and property.

35. Mr. Sturgeon fears for the loss of his home and the safety of his personal property.

36. Mr. Sturgeon's property will be subject to being destroyed at that time.

***Threat of Destruction of Further Encampments***

37. Since the destruction of the first encampment in April, residents of the encampments have reasonably feared that their homes may be destroyed.

38. One advocate for the homeless said the day after the encampment was destroyed in April that, "[w]e were getting calls all night long with people crying that their tents are going to be dozed down. I mean last night was pretty bad."[19]

---

[18] Wheeling-Ohio County Health Dept., Project Hope, https://www.ohiocountyhealth.com/other-services/project-hope/ (last visited Sept. 2, 2020).
[19] *Advocates Respond After City of Wheeling Dismantles Homeless Camps*, WTRF (Apr. 17, 2020) https://www.wtrf.com/news/local-news/advocates-respond-after-city-of-wheeling-dismantles-homeless-camps/.

11

39. Another advocate, concerned by displacement of individuals during the COVID-19 crisis, said, "We have some of the folks with the most severe mental health issues in tents. The severest of the mentally ill."[20]

40. The fear of residents and advocates is justified. An article published on April 22, 2020 after the destruction of tent encampments quoted Wheeling's police chief as saying the following: "What took place last week [the destruction of encampments] was based on my recommendation, and I will continue to make them in these situations."[21]

41. Undersigned counsel on April 19, 2020 sent a letter to City Manager Robert Herron, outlining concerns about lack of adequate notification and the threat of the COVID-19 pandemic, and requesting that the City commit to immediately ceasing any efforts to tear down encampments.[22]

42. The City in its response stated that it was "reviewing the concerns" brought forward in the letter, but did not commit to ceasing or even delaying the destruction of encampments during the pandemic.[23]

43. Although the City's position in April of this year appeared to be that the razing of a person's residence is justified because crime has reportedly occurred

---

[20] *Id.*

[21] *Homeless Encampment Booby Trapped,* LedeNews (Apr. 22, 2020), https://ledenews.com/homeless-encampment-booby-trapped/?fbclid=IwAR0ebA1UizoEwVlTEYrmL9Yfsd5pCpB3AlJ4hPmltogdwdFe9k6vAqqe0ko.

[22] *See* Letter from ACLU-WV to City Manager Robert Herron, attached as Exhibit C.

[23] *See* Response from City Solicitor to ACLU-WV, attached as Exhibit D.

in the areas around where the encampments are placed,[24] scarce if any details have been offered publicly as to whether or not anyone residing in the City's encampments has been convicted of any of the crimes that have been reported. Nor does it seem any statement has been made publicly as to how reports of criminal activity justify targeting the encampments of all residents in those areas.

## JURISDICTION AND VENUE

44. This is an action for injunctive and declaratory relief for the class pursuant to 28 U.S.C. § 23(b)(2), and injunctive relief pursuant to 42 U.S.C. § 1983 to protect Plaintiffs' rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 1343 based on questions of federal statutory and constitutional law, and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

45. This Court has supplemental jurisdiction over Plaintiff's claims for rights protected under the West Virginia State Constitution pursuant to 28 U.S.C. § 1367.

46. Venue is proper in the United States District Court in the Northern District, Wheeling Division, in that the events and conduct complained of herein all occurred in Ohio County.

## CLASS ALLEGATIONS

47. Plaintiff brings this action on their own behalf and behalf of other similarly situated individuals, pursuant to Rule 23 of the *Federal Rules of Civil Procedure*. The class consists of all people who fear that the City will proceed with

---

[24] *Wheeling Dismantles Three Homeless Camps, Citing Complaints of Criminal Activity*, WTRF (Apr. 16, 2020) https://www.wtrf.com/news/local-news/wheeling-dismantles-3-homeless-camps-citing-complaints-of-criminal-activity.

its stated intention to destroy tent encampments on September 4, 2020. The plaintiff class consists of all encampment residents living in the City of Wheeling who have been, are now, or will in the future be, temporarily living on public property.

48. The requirements of Rule 23 are satisfied as follows:

(a) The class is numerous, with approximately 30-40 members, and joinder is impracticable due to the members' general transience as homeless individuals, physical and/or mental disabilities, and economically-impoverished status, all of which would frustrate the coordination of multi-plaintiff litigation involving the entire group of affected individuals;

(b) There are questions of law and fact common to all members of the class, which predominate over any questions affecting only individual members, regarding the threat to the future destruction of encampments in Wheeling. All plaintiff class members have the same federal rights (a) to be free from unreasonable property seizures under the Fourth Amendment to the United States Constitution; (b) to receive adequate notice and other procedural due process protections whenever the City deprives them of their personal property, as guaranteed by the Fourteenth Amendment to the United States Constitution; and (c) the right to be compensated when the City takes their personal property for public use, as guaranteed by the Fifth Amendment to the United States Constitution.

(c) Common questions of fact and law include the following: Whether the City has a policy, practice or custom of seizing and destroying homeless people's property; (b)Whether the City has a policy, practice or custom of seizing and destroying homeless people's property without adequate procedural due

process protections; (c) Whether the City's policy, practice or custom of seizing and destroying homeless people's property is an unreasonable, warrantless property seizure under the Fourth Amendment to the U. S. Constitution; and (d) Whether the procedural due process protections provided under the City's policy, practice or custom of seizing and destroying homeless people's property satisfies Fourteenth Amendment due process requirements.

(d) The claims of the named plaintiff are typical of the claims of the class. The named Plaintiff's claims arise from the same course of conduct as claims of the proposed class, and their claims are based on the same legal theories as those of the proposed class.

49. The Plaintiff has displayed an interest in vindicating the rights of the class members, will fairly and adequately protect and represent the interests of the class, and are represented by skillful and knowledgeable counsel. The relief sought by the named Plaintiff will inure to the benefit of the class generally.

50. By previously seizing and destroying the personal property of encampment residents without warrant, procedural due process and just compensation, Defendants have acted on grounds generally applicable to members of the class. As a result, declaratory and injunctive relief with respect to the entire class is appropriate. The Plaintiff's and prospective class members' rights to security in the personal papers and effects, to procedural due process attendant to any governmental deprivation of property can best be addressed through one action on their behalf.

51. A class action is superior to other methods for the fair and efficient adjudication of this controversy and this litigation presents no unusual manageability problems.

## FIRST CAUSE OF ACTION
### Violation of Civil Rights under 42 U.S.C. § 1983
### And the Fourteenth Amendment to the United States Constitution
### (Right to Procedural Due Process)

52. Plaintiff incorporates by reference the foregoing paragraphs.

53. Defendant's practice and policy of seizing and destroying homeless person's property without reasonable notice, an opportunity to contest the seizure and an opportunity to retrieve the property constitutes a deprivation of property without due process of law, and any further sweep of encampments under these practices and/or policies will violate Plaintiffs' procedural due process rights guaranteed by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983.

## SECOND CAUSE OF ACTION
### Violation of Civil Rights under 42 U.S.C. § 1983
### And the Fifth and Fourteenth Amendments to the United States Constitution
### (Right to Substantive Due Process)

54. Plaintiff incorporates by reference the foregoing paragraphs.

55. Defendants' policy and practice of seizing and destroying property deprives Plaintiff and members of the prospective class of fundamental rights, including the rights to their homes and their belongings, which are vital to their emotional and physical well-being, and any further sweep of encampments under these practices and policies will violate their right to substantive due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983.

### THIRD CAUSE OF ACTION
**Violation of Civil Rights Guaranteed Under 42 U.S.C. § 1983
and the Fourth Amendment to the United States Constitution
(Right to be Secure from Unreasonable Seizures)**

56. Plaintiff incorporates by reference the foregoing paragraphs.

57. Defendant's practice and policy of seizing and destroying homeless person's property constitutes an unreasonable warrantless seizure without probable cause and any further sweep of encampments under these practices and/or policies will violate the rights of Plaintiff and members of the prospective class under the Fourth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. §1983.

### . FOURTH CAUSE OF ACTION
**Violation of Civil Rights Guaranteed Under Article III, Sections 10 and 17
of the West Virginia Constitution
(Right to Procedural Due Process)**

58. Plaintiff incorporates by reference the foregoing paragraphs.

59. Defendants' policy and practice of seizing and destroying property without notice and an opportunity for a hearing will deprive Plaintiff and members of the prospective class of their rights to due process and to a remedy by due course of law, and any further sweep of encampments under these policies and practices will violate Plaintiffs' rights as guaranteed by Article III, Sections 10 and 18 of the West Virginia Constitution.

### FIFTH CAUSE OF ACTION
**Violation of Civil Rights Guaranteed under Article III, Sections 1 and 10
of the West Virginia Constitution
(Right to Substantive Due Process)**

60. Plaintiff incorporates by reference the foregoing paragraphs.

61. Defendants' policy and practice of seizing and destroying Plaintiffs' property deprives Plaintiff and members of the prospective class of fundamental rights—their homes and their belongings, which are vital to their emotional and physical well-being, and any further sweep of encampments under these policies and practices will violate Plaintiffs' right to substantive due process under Article III, Sections 1 and 10 of the West Virginia Constitution.

**WHEREFORE**, in consequence of the heretofore stated facts and allegations, Plaintiffs request that the Court order the following relief:

62. Declare that the Defendants' policy, practice, and/or acts of seizing and destroying the personal property of encampment residents:

   (a) violates the Plaintiff's rights to be free from unwarranted searches and unreasonable seizures of their personal property under Article III, Section 6 of the West Virginia Constitution, the Fourth Amendment to the U.S. Constitution, and 42 U.S.C. 1983; and

   (b) violate the Plaintiff's substantive and procedural due process rights under Article III, Sections 1, 10, and 17 of the West Virginia Constitution, the Fourteenth Amendment to the U.S. Constitution, and 42 U.S.C. Section 1983, as set forth above; and

   (c) should be brought into conformity with the guidelines of the Centers of Disease Control and Prevention regarding homeless encampments.

63. Issue preliminary and permanent injunctive relief enjoining the Defendants, their officials, officers, employees, agents, assigns, and those acting in concert with it, from conducting any property sweeps of encampment residents' personal property until adequate policies are promulgated to protect and safeguard plaintiffs' Fourth, Fifth and Fourteenth Amendment Rights;

64. Certify a class, pursuant to West Virginia Rule of Civil Procedure 23, consisting of the individuals who are in reasonable fear for the imminent destruction of their residences and retaliation by City officials and employees;

65. Award Plaintiff costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

66. Provide any and all other relief as may be just and equitable.

**PLAINTIFF RESPECTFULLY DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

by Counsel,

/s/ Loree Stark
Loree Stark
West Virginia Bar No. 12936
ACLU of West Virginia Foundation
P.O. Box 3952
Charleston, WV 25339-3952
(914) 393-4614 / (304) 345-0207 (f)
lstark@acluwv.org

Patrick S. Cassidy
WV State Bar No.671
Timothy F. Cogan
WV State Bar No.764
Cassidy, Cogan, Shapell and Voegelin, LC,
The First State Capitol,
1413 Eoff Street,
Wheeling, West Virginia, 26003.

## VERIFICATION OF MERVIN G. STURGEON

I, Mervin B. Sturgeon, hereby declare as follows:

I am over the age of eighteen and otherwise competent to testify.

I HEREBY DECLARE, UNDER PENALTIES OF PERJURY, THAT THE FACTUAL ALLEGATIIONS IN THE COMPLAINT ARE, TO THE BEST OF MY KNOWLEDGE AND BELIEF, TRUE AND ACCURATE.

/s/ Mervin B. Sturgeon
Mervin B. Sturgeon